1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF INDIANA
2                INDIANAPOLIS DIVISION

3

4  UNITED STATES OF AMERICA,        )
                  Plaintiff,        ) CAUSE NO.:
5                                   ) 1:07-CR-125-04-SEB/KPF
                                    ) Indianapolis, Indiana
6        -v-                        ) **January 15th, 2010**
                                    ) 10:20 a.m.
7  JESUS MANUEL FIERRO-MENDEZ,      )
                  Defendant.        )
8

9

10                   **Before the Honorable**
                **SARAH EVANS BARKER, JUDGE**
11

12          OFFICIAL REPORTER'S TRANSCRIPT OF
                     SENTENCING
13

14 **For Government:**      Bradley A. Blackington, Esq.
                         Assistant U.S. Attorney
15                        United States Attorney's Office
                         10 West Market Street
16                        Suite 2100
                         Indianapolis, IN  46204
17
18 **For Defendant:**       Gary Joel Hill, Esq.
                         LAW OFFICE OF GARY HILL
                         801 North El Paso
19                        Suite 200
                         El Paso, TX  79902
20
   Court Reporter:       Laura Howie-Walters, CSR, RPR
21                        Official Court Reporter
                         United States District Court
22                        46 E. Ohio Street
                         Room 217
23                        Indianapolis, Indiana  46204

24

25          PROCEEDINGS TAKEN BY MACHINE SHORTHAND
   TRANSCRIPT PRODUCED BY ECLIPSE NT COMPUTER-AIDED TRANSCRIPTION

2

1                        (Open court.)

2          THE COURT:  Good morning, all.  You may be seated.

3   Mr. Hill, I'm sorry to hear about your tumble this morning.

4          MR. HILL:  Well, it was either you or the hospital,

5   and I chose you.

6          THE COURT:  Well, I guess I'm honored, but I hope

7   you can let me know if I can help you get some attention.

8          MR. HILL:  Thank you, Your Honor.

9          THE COURT:  I'll be glad to make a call or two.

10          MR. HILL:  I appreciate that.

11          THE COURT:  What time is your plane back?

12          MR. HILL:  At four this afternoon, I believe.

13          THE COURT:  Okay.

14          This doesn't need to be on the record.

15                  (Off-the-record discussion.)

16          THE COURT:  Mr. Hernandez, nice to have you in court

17   today, and we surely do appreciate your services.

18          THE INTERPRETER:  Thank you, Your Honor.

19          THE COURT:  Would you be sworn, please.

20                  (Interpreter sworn)

21          THE COURT:  Thank you.

22          And, Miss Schneeman, would you call the matter

23   before the Court, please.

24                  (Call to order of the Court)

25          THE COURT:  All right.  This matter's on the Court's

1  calendar for entry of a plea -- no, for sentencing, sorry.

2  The plea was entered on May 26th, 2009.  So today's hearing is

3  to permit the Court to receive the information that bears on

4  the decision that has to be made about a reasonable sentence

5  to be imposed as punishment.

6          So, Mr. Hill, would you escort Mr. Fierro-Mendez to

7  the podium, please.

8          Mr. Blackington, I didn't mean to ignore you.  It's

9  nice to see you in court today, too.

10          MR. BLACKINGTON:  Nice to see you as well, Judge.

11          THE COURT:  Buenos dias.

12          THE INTERPRETER:  Good morning.

13          THE COURT:  Are you Jesus Manual Fierro-Mendez, the

14  same person named by the Clerk who just called this matter?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Mr. Fierro-Mendez, what is your age now,

17  please?

18          THE DEFENDANT:  47 years old.

19          THE COURT:  And how far did you go in school?

20          THE DEFENDANT:  That would be elementary -- no,

21  excuse me, that would be high school.

22          THE COURT:  High school?  Okay.

23          The Presentence Report shows that you went to school

24  in Mexico for about 11 years; is that accurate?

25          THE DEFENDANT:  Yes.

1          THE COURT:  Prior to coming to court today, I know

2    you've been in custody, but have you consumed any substance,

3    alcohol, medicine or narcotic, that would interfere with your

4    ability to understand and participate in this hearing?

5          THE DEFENDANT:  No.

6          THE COURT:  Are you under the care of a doctor for

7    any condition that might interfere?

8          THE DEFENDANT:  Only for high blood pressure.

9          THE COURT:  Do you have medication for that?

10         THE DEFENDANT:  Yes.

11         THE COURT:  And you take it regularly?

12         THE DEFENDANT:  Yes.

13         THE COURT:  And did you receive your most recent

14   dose?

15         THE DEFENDANT:  Last night.

16         THE COURT:  Very good.  You recall -- I recall in

17   any event, and probably you do, too -- your appearance before

18   the Court in May when you entered your plea of guilty to this

19   charge against you.  Do you remember that, sir?

20         THE DEFENDANT:  Yes, ma'am.

21         THE COURT:  The probation department, after that

22   hearing, prepared a Presentence Investigation Report.

23   Mr. Adamson, who's sitting over at that table, do you

24   recognize Mr. Adamson?

25         THE DEFENDANT:  Yes, I saw him on the TV, I believe.

1          THE COURT:  Okay.  He prepared the Presentence

2     Investigation Report in this case.  And having prepared the

3     report, he's sent it around for everyone to read and review.

4     And after that process was completed, this matter was set down

5     for the sentencing hearing because we'll use this report now

6     to help fashion a reasonable sentence.

7          So my question, my first question to you with

8     respect to the report is did you read the report and have it

9     translated for you?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Did you have sufficient time to go over

12     it with Mr. Hill so that you have the benefit of his advice?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Mr. Hill, did you have sufficient time

15     to review the report and discuss it with Mr. Fierro-Mendez?

16          MR. HILL:  Yes, Your Honor.

17          THE COURT:  Mr. Blackington, have you had sufficient

18     time to review the report and prepare for the hearing today?

19          MR. BLACKINGTON:  Yes, Your Honor.

20          THE COURT:  When you read through the report and had

21     it interpreted for you, Mr. Fierro-Mendez, you probably

22     noticed, but I want to make sure that you noticed, that it has

23     two kinds of information in it.  One part of the report is a

24     compilation of biographical information about you, so anyone

25     who reads the report would learn about your family, your

1   health, your education, all of those things.

2           The other part of the report has to do with this

3   offense that you've been found guilty of and how the

4   sentencing guideline is applied.  Did you notice that about

5   the report, that it has those two kinds of information?

6           THE DEFENDANT:  Yes.

7           THE COURT:  This is a document that is tailor-made

8   to you.

9           Step back just a little bit because I think you're

10  in the line of transmission between the microphones.  Just

11  step back about -- that's good.

12          This is a document that is retained in the court's

13  records, we say under seal, S-E-A-L, which means it's kept in

14  a confidential status, and therefore is not revealed to the

15  public or to the media.  There are a few other official uses

16  that can be made of it, but it's limited to those.

17          Do you understand that, sir?

18          THE DEFENDANT:  Yes.

19          THE COURT:  In addition to the report, nothing has

20  come to me that I've withheld from you.  So there have been no

21  letters, no communications with the lawyers that excluded you.

22  Sometimes I have to confer with the lawyers.  I never confer

23  with just one lawyer on a case, but sometimes I have to confer

24  with both to get a case moving forward so that we can get the

25  matters resolved, that sort of thing.  But that sort of

1   conference wasn't required, and so you know everything that I

2   know of a factual nature on the basis of which I'll make a

3   sentencing decision today.

4           Do you understand that, sir?

5           THE DEFENDANT:  Yes.

6           THE COURT:  Now, Mr. Adamson has prepared a memo to

7   me to assist me in fashioning a sentence.  There are no new

8   facts in his memo.  His memo relates to what's in the report

9   that you've seen and reviewed.  His memo is a confidential

10  document, and he's prepared it pursuant to our court rules.

11          The primary purpose of it is to help me to tie up

12  all the loose ends when it's time to pronounce sentence so I

13  don't leave something out.  You're not prejudiced by his memo

14  in any way because there's no factual information in there

15  that you haven't had access to.

16          Do you understand that, sir?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Now, as you can tell from the report, we

19  cover -- part of what the report covers is the sentencing

20  guidelines and how they apply to your case.  Did you notice

21  that?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Now, we use the guidelines to assist the

24  analysis as to what a reasonable sentence is.  My obligation

25  under law is to impose a reasonable sentence.  And that word

1  "reasonable" has a special meaning in this context.  It means

2  reasonable under law, and the law sets out the criteria for a

3  reasonable sentence.  And Mr. Adamson has included those at

4  the end of the Presentence Report.  He's listed them in

5  paragraph 71.

6          Those seven factors -- I'll just mention them just

7  to remind you:  The first one is the nature and circumstances

8  of the offense, and the history and characteristics of you in

9  terms of your commission of the offense.  The second one is

10  the sentence must reflect the seriousness of the offense and

11  promote respect for the law and so forth.

12          Those factors are the factors imposed by law on my

13  decision-making.  And to the extent that I can accomplish a

14  sentence that encompasses those factors, it will be deemed

15  legally reasonable.

16          So we use the guidelines because, in many respects,

17  the guidelines incorporate these factors, but they don't have

18  the last word on the matter, even though they're influential.

19  After we do the guideline calculation, we ask one more

20  question.  We say "Okay, that's how the guidelines come out,

21  but is that reasonable here in Mr. Fierro-Mendez's case?"

22          So that's where we're headed and that's what I'm

23  thinking about.  Those will be the factors that I'm listening

24  for as I try to make a reasoned judgment here as to a

25  reasonable sentence.  Do you understand that, sir?

1          THE DEFENDANT:  Yes.

2          THE COURT:  Is what I have told you essentially what

3 Mr. Hill has told you?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Now, according to your plea agreement, I

6 just harken back in a summary way, you are leaving the issue

7 of the sentence up to me to decide by virtue of your plea

8 agreement.

9          The Government has agreed, based on your

10 cooperation, to make a decision as to whether your cooperation

11 warrants their filing what we call a Rule 35 motion, which

12 basically is a post-sentencing motion that allows the Court to

13 look at the sentence again and see if it deserves to be

14 reduced because of your cooperation.

15          Do you remember making that a part of your plea

16 agreement?

17          THE DEFENDANT:  Yes.

18          THE COURT:  And you've also executed, as a part of

19 your plea agreement, an appeal waiver without any conditions.

20 As a part of your plea, you're giving up your right to appeal

21 the sentence that's imposed today.  Do you remember making

22 that a part of your agreement?

23          THE DEFENDANT:  Yes.

24          THE COURT:  So when the report was circulated for

25 all to review, according to the addendum, neither side had any

10

1  objections to the way in which Mr. Adamson interpreted and

2  applied the guidelines.

3           Is that your view, Mr. Hill?

4           MR. HILL:  It is, Your Honor.

5           THE COURT:  And yours, Mr. Blackington?

6           MR. BLACKINGTON:  It is, Your Honor.

7           THE COURT:  My own judgment is that Mr. Adamson has

8  correctly interpreted and applied the guidelines.  So I will

9  use this formulation that's laid out in the report as the

10 beginning point for my decision on what a reasonable sentence

11 is.

12          The upshot of this guideline application is that you

13 have a total offense level of 41 and a criminal history

14 category of 1.  Do you remember how we got to those numbers?

15          THE DEFENDANT:  Yes.

16          THE COURT:  And you understand that we use them

17 basically to look at the sentencing table.  Do you remember

18 seeing this sort of table?  And we go down 41, which is pretty

19 far on this chart, it's clear down here (indicating), and the

20 criminal history category 1.  And the other guidelines are in

21 the manual that happens to be the convenient place for the

22 sentencing table, so I just show it to you to refresh your

23 memory.

24          But the guidelines that apply in your case are 324

25 months on the low end up to 405 months on the high end.

1  You're not eligible for probation.  The period of supervised

2  release, the guideline term is five years.  The statute says

3  no less than five years.

4          The fine range is $25,000 on the low end up to

5  $4 million on the high end.  Restitution, which means paying

6  back the victims of the offense, doesn't apply, but the $100

7  special assessment is a fee that has to be paid to the Clerk

8  and it's mandatory.  So that will be part of any judgment

9  that's imposed.

10          Can that be paid today, Mr. Hill?

11          MR. HILL:  Yes, ma'am.

12          THE COURT:  Would you see that that's done at the

13  Clerk's office --

14          MR. HILL:  Yes, I will.

15          THE COURT:  -- before you leave?

16          MR. HILL:  Yes, ma'am.

17          THE COURT:  So those are the guidelines that apply

18  to your case, and that's the starting point for the decisions

19  that have to be made.  Do you agree with that extrapolation,

20  Mr. Hill?

21          MR. HILL:  I do, Your Honor.

22          THE COURT:  And do you, Mr. Blackington?

23          MR. BLACKINGTON:  Yes, Your Honor.

24          THE COURT:  So it's appropriate, Mr. Fierro-Mendez,

25  for you to speak and tell me whatever it is you want me to

1  know and think about and take into account.

2         Once the sentence is imposed today, it's not likely

3  that there will be another opportunity to make this decision.

4  It's sort of a now or never matter.  So don't put off till

5  some other time whatever it is you think will be helpful to

6  me, and that you would like me to know in fashioning a

7  sentence assuming there will be another time, because there's

8  not likely to be.

9         After I hear from you, then I'll hear from Mr. Hill

10  on your behalf.  And I'll hear from Mr. Blackington on behalf

11  of the Government, and then I'll make the decision as to a

12  reasonable sentence.

13         So you may lead off, sir.

14         THE DEFENDANT:  Thank you.  I am 47-years-old and I

15  have six children.  I have cooperated even before I ran into

16  problems.  I've cooperated with the Government of the United

17  States.  I continue to cooperate.  I have been in custody for

18  one year and three months, and I continue to cooperate.

19         The crime that I acknowledge, it happened due to a

20  situation that we were living down in Ciudad, Juarez.

21  Currently, that problem still persists.  It is even worse, and

22  we have the opportunity of helping the community on both

23  sides.

24         What I have been requesting even before I was

25  arrested is that they would give me the opportunity to do it,

1   and I continue to ask for that, Your Honor.   Thank you.

2         THE COURT:   Well, I suspect you have a lot of

3   information you could give the Government based on the offense

4   you're convicted of here.   The amount of cocaine that you were

5   responsible for transporting, in conjunction with this

6   particular case, 1,600 kilograms of cocaine is -- it's a

7   horrific amount.   It's a mind-boggling amount.

8         The Presentence Report says 50 kilograms each week

9   during about an eight or nine-month time frame, and that in

10   terms of getting it here, you were an organizer and you were a

11   leader of the effort to get it here.

12         So the amount of harm that was caused from that, the

13   amount of damage that you do to the societal fabric by

14   injecting that kind of cocaine amount into the community is --

15   well, it's just almost impossible to imagine how you justified

16   it at the time and justified it to yourself.

17         I know from the Presentence Report that you don't

18   personally use drugs; is that true?

19         THE DEFENDANT:   It is true.

20         THE COURT:   So this was your business, this was your

21   way of life.   This large-scale drug dealing was how you

22   decided that you were going to get whatever money you

23   needed to live on.   And in the process, of course, you put

24   everything at risk, but I have to imagine, because I read the

25   newspapers, we all read the newspapers and we follow the

1 reports, that the kind of risk that you've brought upon

2 yourself and your family now by even being involved in this is

3 the greatest risk of all, that you've placed in danger your

4 family and your children, and you've placed them in danger in

5 a way that you can't possibly protect them because you're

6 going to be locked up.

7          So I have to assume during the period of time that

8 you were engaged in this, you weren't thinking about these

9 things, but I'm hoping that having been arrested and charged

10 and now having admitted them, you've thought about them

11 perhaps for the first time.

12          Any way you look at the guideline sentence of 320

13 months to 400 months, it's a long time.  And at the end of the

14 sentence, there's a likelihood that you'll be deported as

15 well.  So by then, your children will be grown.  I hope your

16 wife will still be around and in good health, but her life

17 will have changed, too, as yours did.

18          So I can't imagine under what series of thoughts you

19 thought this was worth it.  Was it worth it?

20          THE DEFENDANT:  Of course not.

21          THE COURT:  Well, maybe you can somehow communicate

22 that to your children so they know that they don't have to

23 learn by making the same horrendous mistakes that you made.

24 We'll hope for that.

25          Mr. Hill, what would you say on Mr. Fierro-Mendez's

1  behalf?

2          MR. HILL:  Your Honor, since my -- since my

3  involvement began in this case, Mr. Fierro has been

4  cooperating with the Government both here and in El Paso.  He

5  is scheduled to be a witness in a case involving a major drug

6  dealer within the next couple of weeks in El Paso.

7          You know, this is such a -- he was a very good

8  police officer.  He did -- he was, you know, like the head of

9  the SWAT team and stuff in Juarez, and he alienated both

10  sides.  There are two sides to things in Juarez.  There's the

11  La Linea, the Juarez Cartel, and there's the Sinaloa Cartel,

12  and they are the ones that are fighting and killing each other

13  now.

14          His brothers are involved in this business, and I

15  know he doesn't speak about his brothers, but they saved his

16  life because the cartel people had come to the hospital.  He

17  had been wounded and they had come to the hospital, the cartel

18  people, to pick him up to kill him because he didn't cooperate

19  with the cartels.

20          Well, as a result, his brother saved him and then

21  they, you know, it's the godfather principal.  I mean, they

22  tell him "Okay, we saved you.  Now you have to do something

23  for us."  And that's how he got involved in this was his

24  loyalty to his brothers, and the fact that he felt like he

25  owed them because they had saved his life; otherwise, he

1  wouldn't have been here to do anything anyway.  And that was

2  the involvement here.

3          Now, the amounts that are attributed to him, I

4  realize that was -- but his actual involvement was less than

5  1,600 kilos, but at any rate --

6          THE COURT:  That's what the Presentence Report says,

7  you know.

8          MR. HILL:  Yes, ma'am.  And since his arrest, he's

9  cooperated and continues to cooperate.  He's given -- I've sat

10 in debriefings and interviews with him with the Drug

11 Enforcement, with Homeland Security, with all kinds of people,

12 and he has cooperated.  I mean, he's given them so much

13 intelligence.

14         Now, Russell Leachman is the U.S. Attorney that's

15 handling the case in El Paso, and he's a very close friend of

16 mine.  And he told me, he said, "You know, this guy is about

17 as high up and has as much knowledge about just the inner

18 workers of things in Mexico, and especially in Juarez," as

19 anyone he's ever heard about or seen.

20         And, you know, he has children from a prior marriage

21 that resided in Mexico.  They've finally gotten them over to

22 El Paso.  We had a real problem with that also.  But, you

23 know, we had to keep everything under wraps because we were

24 afraid that something would happen to them because those

25 people over there are very ruthless.

1           THE COURT:  That's what I understand.

2           MR. HILL:  I mean, we live with it every day, you

3    know.  We had 69 deaths in one day a week ago over there.  And

4    Mr. Fierro is -- he was in a unique position in that the major

5    people in the cartels would court him and try to get him to do

6    work for them.

7           So he has an extraordinary amount of knowledge about

8    the inner workings of who's who and what's what.  And he had

9    already begun to cooperate with ATF and with Customs down

10   there in El Paso prior to this happening.  But, you know, for

11   whatever reason, the other agencies said it was just too much

12   for them.  It ended up now it's not too much for DEA but, you

13   know, there's so many aspects to this case and so many loose

14   ends and so many things going on that he is clearing up for

15   the Government.  And it's just -- it's a continuous thing, and

16   I'm sure it's going to go on for the next, you know, year, two

17   years, something like that.

18          I mean, my involvement in this case doesn't end

19   here.  I'm listening, you know, to all this, and I'm hearing

20   what's going on in the interviews.  And I know that a lot of

21   stuff -- a lot of information that he's given them is just

22   that, information.  It doesn't rise to the level of

23   substantial assistance, but he has given them a road map as to

24   how things work over there, who's involved, which people --

25   he's helped identify people.

1          He even -- Sylvestre Reyez is our United States

2     Representative, and I was the best man at his brother's

3     wedding.  He was a sheriff in El Paso.  And I went to a

4     Christmas party with Sylvestre Reyez.  He even was responsible

5     for identifying a person who had -- and was responsible for

6     getting released the niece of Sylvestre Reyez that they had

7     kidnapped over in Juarez.

8          And, I mean, he's done a lot of good things.  I know

9     that this is a terrible offense, but at the same time, I think

10    he's really trying to right his wrongs.  I mean, he's going to

11    testify in the case that's coming up, and then there are going

12    to be more cases as a result of this.

13         And, you know, right now, the main person in Mexico

14    that's left is Joaquin Guzman, Chapo Guzman; and Mr. Fierro

15    knows him personally, has met him, knows of locations and

16    things that they need, and has identified all of this for the

17    Government.  I've been there every time when they've had these

18    discussions, and they go on for hours and hours.

19         And I talk to Mr. Fierro usually once or twice a

20    week.  His wife goes to my office.  And she's even trying to

21    cooperate with the Government to help him, and is putting

22    herself out there, you know, that -- there's still some

23    activity that's going on up here that they're trying to work

24    on.

25         But I guess what I'm trying to say is that I would

1  ask the Court to consider the lower end of the guideline range

2  because he -- I mean, you know, 27 years is 27 years any way

3  you cut that.  And with what he's trying to do and what he's

4  attempting to do, I see that he really is trying to right his

5  wrong here.

6          Not only that but, you know, I anticipate there will

7  be maybe even more than one request for a Rule 35 because

8  what's happened is Russell Leachman, the U.S. attorney that's

9  handling this case, has told me, he said, "It's kind of

10 piecemeal as we go."  He said, "After he testifies on

11 Arandula, then we'll make a Rule 35 motion."

12         There's some things going on up here that if they

13 could come to fruition, then he would get a request on that

14 end.  There's some other cases in El Paso that he's attempting

15 to help with, things that he's helping to do right now that

16 may result in that.  But I guess my request is that despite

17 the gravity of this crime and the situation, I'm asking the

18 Court to consider the fact that he's doing everything he can

19 at this point to correct things.  Thank you.

20         THE COURT:  What happened to that AK47?  Was it

21 seized?

22         MR. HILL:  You know -- yes, ma'am.  What happened,

23 the ATF people or the Customs people in El Paso knew about

24 this gun, and had told him, you know, "Yeah, you can keep it

25 there for your protection" because there had been a couple of

1    incidents that happened there that --

2              THE COURT:  An assault weapon?

3              MR. HILL:  Yes, ma'am.  He's an expert with it.  I

4    mean -- but all I'm saying, he had those in his police career

5    all the time, but they were well aware of it.

6              It's the strangest situation, you know, and I

7    haven't been able to get a handle on it completely, but there

8    were people from Homeland Security and some Customs people and

9    everything else that were there because the people that he was

10   dealing with originally, the agents from other -- not from

11   DEA.  DEA is probably the most competent group that I see, you

12   know.  I mean, they do the best work and their cases are the

13   best cases.

14             But what had happened was that they took him up to a

15   certain point, and then they just said -- they kind of let him

16   go, you know, just unleashed him there.  I mean, just told him

17   "You can keep that gun there, you can do" this and that, but

18   they told him right at the end of the thing, they said, "This

19   is just too big for us, we can't deal with it."  And they just

20   walked away, I mean, right in the middle of all of this.

21             There's some concern on the part of the authorities

22   in El Paso, the federal authorities in El Paso, that there was

23   some maybe collusion, cooperation, something, between some of

24   these agents and the people in Juarez.  That's a totally

25   separate issue, totally separate thing.  It's ongoing also,

1  but the weapon was seized.  It was at his house is where it

2  was.

3         And, you know, there had been some attempts to pick

4  up his wife, to pick him up.  Those things -- you have no idea

5  what life is like in El Paso.

6         THE COURT:  Well, it sounds to me like it's almost

7  totally lawless.

8         MR. HILL:  It is.

9         THE COURT:  Sort of a jungle.

10         MR. HILL:  It is.  And much more so in Juarez.  They

11  have destroyed that city.  And, you know, they cross over

12  frequently.  They kidnap people in El Paso, take them back to

13  Mexico.  They find their bodies and things.  It's not unheard

14  of.  I mean, it's very common.

15         THE COURT:  Sad.

16         MR. HILL:  Yes.  It's --

17         THE COURT:  Deeply sad.

18         MR. HILL:  It's a hard place to live.  I haven't

19  been there in maybe two years just because, you know, I don't

20  have much fear of anything, never have, but I'm not going to

21  stick my head in the noose either.

22         THE COURT:  Showers in Indianapolis you probably

23  ought to fear a little bit more.

24         MR. HILL:  You know, I think Mr. Blackington and

25  Cody set that trap for me.

1          THE COURT:  You think they did?

2          MR. HILL:  I think they did.

3          THE COURT:  They chose that room for you, did they?

4          MR. HILL:  They did.

5          No, but -- you know, he had the gun, but it was for

6   his protection, because there had been attempts to pick him

7   up.  I mean, there was one time he was on the roof for like

8   three hours because they were trying to pick him up.  And the

9   cars had been seen and he called the people and nobody came to

10  his rescue.

11         THE COURT:  Wow.

12         MR. HILL:  So, I mean -- and he was in El Paso

13  thinking he was safe, but no, he wasn't safe.

14         THE COURT:  Mr. Blackington, what's the Government's

15  view?

16         MR. BLACKINGTON:  Your Honor, first of all, I

17  appreciate the cooperation he's given.  It's largely been

18  confined to El Paso.  And the U.S. Attorney's Office and DEA

19  are handling it in El Paso because it largely doesn't tie into

20  our prosecution.

21         For whatever reason, he wasn't able to identify any

22  of the unidentified males in our cases that we have fugitive

23  warrants for, but I think the important thing at this hearing

24  first of all, is yes, he is cooperating.  Yes, I've agreed to

25  file a Rule 35 motion.

1          At this point, almost a hundred percent of what

2    would be the basis of the Rule 35 motion is some trial

3    testimony he'd be giving in a case in El Paso.  That's about a

4    month or more away.

5          But it's important at this point, I think, to set a

6    base for what the sentence ought to be without the

7    cooperation, and then deal with the cooperation later.  I

8    don't think we should deal with it twice and he should get a

9    benefit from it twice.

10          And what's important to look at here is the

11    courts --

12          THE COURT:  Is it part of your agreement, your

13    promise, to make a Rule 35 motion?

14          MR. BLACKINGTON:  In the trial that's coming up in

15    El Paso, if he testifies at that point, that will be

16    substantial assistance and we will file a Rule 35 motion if he

17    does come through with that, and if the U.S. attorney in

18    El Paso advises me that he's done that, that will happen.

19          THE COURT:  Okay.

20          MR. BLACKINGTON:  This is really one of the most

21    serious drug-trafficking offenses we've had in this district.

22          THE COURT:  It's one of the most serious I've seen.

23          MR. BLACKINGTON:  We don't usually see this.

24    Usually when we get a cocaine dealer who's at a level 38,

25    yeah, he got five kilograms of cocaine for a month for four

24

1    years, and that's how we get over 150 kilograms.  This guy was

2    at that or over it in a month.

3           Compounding the issue here is his role in the

4    offense, and also, what he was.  He wasn't just a police

5    officer as the Presentence Report indicates.  He was a

6    Comandante in the Puma unit in Juarez, which is a drug strike

7    force in Juarez.  And in effect, what was happening is the fox

8    was guarding the chicken house there for many years.  And it's

9    not -- although we haven't pursued and the probation office

10   didn't pursue a two-level adjustment for abuse of trust, it's

11   arguable that it's there.  So his guideline range could have

12   been significantly higher.

13          But when, you know, you look at the violence and the

14   deaths in El Paso -- Danny Delgado's brother-in-law, the Court

15   heard about the circumstances of his murder.  Over -- there

16   were over 10,000 people like that murdered in Juarez last

17   year.  And it's so bad, when Agent Dooley and I went down

18   there to interview a witness last year, we saw this magazine,

19   kind of a business periodical, at the hotel, and right in the

20   middle, they're advertising in both Spanish and English for a

21   car armoring service.

22          The type of things that happen down there, we just

23   don't see up here.  And this is a case really that shows us

24   that what happens in Juarez and what happens in El Paso

25   affects us in Indianapolis in a very dramatic way.

1          So I think that when the Court looks at the

2    guidelines in this case of 324 to 405 months, that's an

3    appropriate range in this case.  And when the Court considers

4    applying a certain sentence within those guidelines, and the

5    Court considers really the fact that he was a high-level

6    police officer in Juarez doing this type of thing, I don't

7    think a sentence at the bottom of the guideline range is

8    appropriate.  I would tend toward the top or at least at the

9    middle of the guideline range because that's a factor that

10   wasn't taken into consideration in calculating the guideline

11   range.

12          This is a very serious offense, and I think that it

13   deserves a very serious sentence.  And from that point, we

14   will advise the Court down the road of what exactly his

15   cooperation was, and the Court can depart downward at that

16   point in time based upon the quality of his cooperation.

17          And as I understand it, speaking with AUSA Leachman

18   down there, that this trial's coming up in a month, month and

19   a half, and there's some stuff beyond that that hasn't panned

20   out as of yet, but I think when we come back here at some

21   point with a Rule 35 motion, assuming he continues to go

22   through with the cooperation, the Court can address that at

23   this point.

24          But I think a very long sentence is warranted here,

25   Your Honor.  This case is just corruption to the core.  It

1  goes right to everything that's bad that we hear about that

2  goes on in El Paso, and a lot of bad up here in Indianapolis.

3  There's a lot of cocaine that got up here as the Court

4  acknowledges.  It warrants a stiff sentence.

5          MR. HILL:  May I say one thing, Your Honor?

6          THE COURT:  Yes, Mr. Hill.

7          MR. HILL:  You know, what all of you need to realize

8  is that mordida, bribery, corruption is a way of life in

9  Mexico from the bottom to the top.  The president -- every

10  president is involved in the drug business as is every

11  governor, as is everybody over there.

12          The people who assume power over there by election

13  or by hook or crook, they are all involved in the drug

14  business.  That -- I told one of my secretaries 25 years ago,

15  I said, "Mexico's going to be a worse problem for us than

16  Columbia ever was."

17          I saw it coming 25 years ago.  I've known it because

18  you can buy your way out of anything over there and everybody

19  gets a cut and everybody gets paid.  The heads of the

20  military -- the military right now is under Joaquin Guzman,

21  Chapo Guzman.  The military works for the Sinaloa cartel;

22  whereas -- I mean, it's just -- it's -- you can't even

23  imagine.  That country, from bottom to top, everybody is on

24  the take.  Everybody's involved in it.  That's just the way

25  life is over there.

1          And I don't think we -- people over here really

2    realize that.  They think "Oh, President Calderon is trying to

3    do all these things for" -- you know, to get -- what happens

4    is the drug dealers will say "Okay, we'll give you this or

5    this" to appease them, to satisfy them, you know, to let them

6    wet their beak.  So that way, it looks like they're really

7    doing something.  They're not doing anything.

8          I mean, that's the way it is over there.  I've done

9    this for 38 years.  I've watched it.  I represented the first

10   drug lord that ever came out of the Juarez area.  His name was

11   Oscar Yanez.  And I've represented most of the major drug

12   lords from the northern part of Mexico over this period of

13   years.  And I've watched them and I know what they do.  I know

14   how they operate.  And, you know, you either -- you either

15   cooperate over there and you play their game or they kill you.

16   That's just the way it is.

17          THE COURT:  That's my impression, too, Mr. Hill.

18   You've seen it more closely than I have, that's for sure,

19   because all I know is what I learn here as a judge, but also

20   what I read and think about.

21          I can't address that sort of macro problem.  It

22   does -- you're correct in bringing it up, though, because it

23   does cast a different light on the deterrence factor that the

24   Court has to fold into the decision here, recognizing that the

25   deterrence issue in that neck of the woods is decidedly

1 different than what it is up here.

2          MR. HILL:  Do you know that right now, LaLinea has

3 been decimated, the Juarez cartel?  I mean, they have killed

4 the stepson of -- I mean, Amado Carillo is not dead.

5 Everybody thinks he's the Lord of the Skies, that guy?  He's

6 not dead.  He has CIA protection.  Everybody knows that.  I

7 mean, you know, third-graders know that.

8          THE COURT:  Is he still in Mexico?

9          MR. HILL:  No, ma'am.  He's here.

10          THE COURT:  In the United States?

11          MR. HILL:  Yes, ma'am, with $13 billion.

12          And at the same time, his brother, Vicente, who took

13 over the cartel there, had a stepson that was involved in it.

14 They called him Hota-elay (phonetic) or Cinco.  His name is

15 Jose Luis.  Supposedly they killed him a month ago but, you

16 know, they have been -- all these murders have been like

17 killing the cockroaches and then getting around to the eggs.

18          But they go down to these out-of-the-way places and

19 they recruit people who make a dollar a week or something, and

20 they bring them in and they become the new Juarez cartel

21 people.  They're just fodder, cannon fodder.

22          THE COURT:  Right.  I know.  I hear you.

23          MR. HILL:  I'm just saying -- I mean, I don't know

24 what the solution is.  I don't know that there's ever going to

25 be a solution.

1          THE COURT:  I wish that there was -- I wish there

2    were a solution.  What I know is that a solution has to be

3    hammered out way beyond anything that a single judge in

4    Indianapolis, Indiana can do.  So I just have to measure the

5    criminal conduct of Mr. Fierro and try to figure out what sort

6    of sentence is appropriate for him.

7          MR. HILL:  Yes, ma'am.

8          THE COURT:  So I'm going to impose a sentence at the

9    low end of the guidelines.  If the Government's correct,

10   there's lots of reasons to go higher.  There's lots of

11   reasons to go above the guidelines, but in doing the low end

12   of the guidelines as the reasonable sentence here -- there's

13   no way you can say 27 months [sic] is an easy sentence --

14         MR. HILL:  Years?

15         THE COURT:  -- and the defendant is 47, so that

16   means he's going to be into old age by the time the sentence

17   is fully served.

18         We may be doing you a favor, Mr. Fierro, by getting

19   you out of that horrific situation that you find yourself in;

20   although I don't want to be glib about this sentence because I

21   know it's not anybody's first choice that you give up your

22   liberty and your freedom.

23         But it sounds like it's just an unsafe place, that

24   it may be that there's at least some benefit to having you

25   removed from it and put in a protected setting.

30

1          The other reason for the 324 months, besides the

2   fact that it's adequate punishment in my opinion, is that it

3   is one way of reflecting the cooperation and the assistance

4   you've already given.  The Rule 35 motion will come if you

5   deliver on your promise to cooperate fully.

6          There is no 5K.1 before the Court for substantial

7   assistance, but according to both lawyers, you've been

8   providing assistance that has been helpful and they expect it

9   to continue.  So that's why I'm imposing the sentence at the

10  low end of the guidelines.

11         Furthermore, if you don't -- if you don't learn the

12  lessons of all of this by the end of a 27-year time period,

13  you never will.  What's going to happen at the end of this

14  sentence is that you'll do like most people.  You'll just sort

15  of mellow out into old age.  There's just a point at which

16  you're not going to do it anymore.

17         So in any event, I think it's almost academic if the

18  sentence is any longer than that because 27 years added on to

19  your 47 years means that you'll be 74 when this sentence is

20  finally done.  That's enough.

21         The period of supervised release, though, the

22  statute says no less than five years, and so I'll make that

23  five years.

24         Miss Schneeman wants me to clarify that the period

25  of time is 324 months, which is 27 years on the time of

31

1  incarceration.

2          Supervised release is five years.  That's what the

3  statute requires, and that's what the guidelines say as well.

4  So it will be subject to these terms and conditions.  You must

5  not commit any other federal, state or local offenses while

6  you're on supervised release.  You must not possess any

7  firearm, ammunition, destructive device or any other dangerous

8  weapon.  You must cooperate with the collection of a DNA

9  sample.  You must refrain from all unlawful uses of controlled

10  substance.

11          I'll require you to submit to one drug test within

12  15 days of placement on supervised release and two periodic

13  tests thereafter.  But you will not, unless there's some drug

14  use that's detected then, have to continue to undergo drug

15  treatment because you don't pose a risk of that.

16          You must give the probation officer access to any

17  requested financial information, and you'll be subject to

18  being searched while you're on supervised release.  That

19  permission to search extends virtually everywhere:  Your

20  person, vehicle, office, business, residence, and property,

21  including computer systems and peripheral devices.

22          You must submit to the seizure of any contraband,

23  which means any illegal property, drugs, guns, computer stuff,

24  anything like that.  So forewarn the other occupants of the

25  premises that you'll be subject to such searches.

1           Upon the completion of imprisonment, you must

2    surrender to the immigration authorities for deportation

3    proceedings pursuant to the Immigration and Naturalization

4    Act.  And if detained, you shall not be required to report to

5    the probation officer within 72 hours of release from

6    imprisonment.  If you're not detained, then you must report

7    within 72 hours of your release.

8           You shall not enter the U.S. illegally.  If you're

9    granted permission by immigration authorities to remain in or

10   legally reenter the U.S. during the period of supervised

11   release, then you must report immediately to the probation

12   officer.

13          I'm not going to impose a monetary fine.  The

14   sentence is very long, and it appears to me you don't have the

15   financial wherewithal to pay it despite your drug activity.

16   The $100 special assessment is mandatory, and so that's part

17   of the judgment as well.

18          So let me ask:  Mr. Hill, do you have a

19   recommendation you want me to make to the Bureau of Prisons

20   about the place of incarceration?

21          MR. HILL:  La Tuna, the Federal Correctional

22   Institution, is right outside El Paso.

23          THE COURT:  Is that going to be a safe place?

24          MR. HILL:  Yes, ma'am.  The safest place you can be

25   is with the federal government.

1          THE COURT:  Mr. Adamson, we'll include that

2     recommendation, please.

3          PROBATION OFFICER:  Yes, Your Honor.

4          THE COURT:  The sentence that I've outlined, do you

5     have any objection to it as a legal matter, Mr. Hill, or do

6     you request any further elaboration of my reasons?

7          MR. HILL:  No, Your Honor.  I'm satisfied.  Thank

8     you.

9          THE COURT:  Do you, Mr. Blackington?

10         MR. BLACKINGTON:  No, Your Honor.

11         THE COURT:  The sentence then, Mr. Fierro, that I've

12    previously outlined as my intended sentence is now the

13    judgment of the Court, and a Judgment and Commitment Order

14    will be drawn up to reflect these elements as I've laid them

15    out here, and they will bind you in these ways until the

16    judgment's fully satisfied.

17         My understanding of your agreement is that you've

18    waived your right to appeal this sentence, but you need to

19    talk to Mr. Hill about that.  I'm not making a ruling.  It's

20    not mine to make.

21         If you think that you've retained a right to file a

22    Notice of Appeal, you should do that.  You must do that within

23    10 days of the entry of judgment.  The judgment won't get on

24    the docket today, but it will be sometime next week that it

25    will, and then you count the ten days out from that if you

1  need to file a Notice of Appeal.

2          The Government has indicated that it intends to and

3  has agreed to file a Rule 35 motion, which will bring the

4  matter of your sentence back before me if you continue to

5  cooperate.  So we'll wait and see on that, but for now, you

6  must serve the sentence that's imposed.

7          So good luck to you, Mr. Fierro.

8          Mr. Hill, thank you, sir.

9          MR. HILL:  Thank you, ma'am.

10          THE COURT:  Thank you, Mr. Blackington.

11          MR. BLACKINGTON:  Thank you, Your Honor.

12          THE COURT:  Stay nearby after the hearing and I'll

13  make my arrangements for you.

14          MR. HILL:  Thank you, ma'am.

15          THE COURT:  Thank you, Mr. Hernandez.

16          THE INTERPRETER:  You're welcome.

17          MR. HILL:  Oh, Your Honor, one request that both

18  Mr. Fierro and his wife have made is that he be allowed to hug

19  her before he leaves here today.  I don't --

20          THE COURT:  I leave those things to the marshal.

21  They usually are as accommodating as they can possibly be, but

22  that doesn't mean they always go along with it.

23          MR. HILL:  Yes, ma'am.

24

25

1                    (Court adjourned.)

2

3

4

5

6

7  _____

8

9              CERTIFICATE OF COURT REPORTER

10

11

12        I, Laura Howie-Walters, hereby certify that the

13  foregoing is a true and correct transcript from reported

14  proceedings in the above-entitled matter.

15

16

17  /S/LAURA HOWIE-WALTERS   May 21st, 2010

18  LAURA HOWIE-WALTERS, RPR/CSR
    Official Court Reporter
19  Southern District of Indiana
    Indianapolis Division
20

21

22

23

24

25